THOMAS W. MEANS

v.

MINNIE E. JENKINS, Ex., etc.

STATUTE OF LIMITATIONS.—In case of money collected by an agent, the Statute of Limitations begins to run from the receipt of the money. Fraudulent concealment to take a case out of the Statute of Limitations must be founded upon some affirmative act; mere silence is not enough. The court is of opinion that appellant did not use reasonable diligence to discover his cause of action before it was barred by the statute.

APPEAL from the Circuit Court of Logan county; the Hon. CYRUS EPLER, Judge, presiding. Opinion filed December 4, 1885.

Messrs. BLINN & HOBLIT, for appellant.

Messrs. BEACH & HODNETT, for appellee.

PLEASANTS, J.   This case was heard by the court below without a jury, upon appeal from the county court, on a claim filed therein December 29, 1883, for $1,011, being for $667 alleged to have been collected by deceased as agent for appellant on March 1, 1875, with interest from that date. There were no written pleadings but the only real issue involved was made up as follows:   Appellee interposed the defense of the Statute of Limitations; appellant replied that deceased fraudulently concealed the cause of action so that he had no knowledge of its existence until within five years, although he used reasonable diligence to discover it, and appellee traversed the allegation of such diligence.   It appears that on December 5, 1874, appellant, then a resident of Boyd county, Kentucky, sold 280 acres of land in Logan county, Ill., in parcels to different parties, among whom were George Rentschler who took eighty acres, and Peter Arnfeldt who took forty, at $50 per acre, each giving a note for one third the price, payable March 1, 1875, with interest at the rate of

*ten per cent. per annum* after maturity, and a series of others for the residue in equal installments due respectively in one, two, three, four and five years from March 1, 1876, with interest at eight *per cent.*    The deceased, who then was and for many years had been county clerk of said county and with whom appellant had been well acquainted since 1860, was present and assisted him in making these sales.    Appellant further employed him to collect the two of said notes first falling due—that of Rentschler for $1,334, and that of Arnfeldt for $667—which he then indorsed in blank and delivered to him for that purpose, taking his receipts therefor, and paid him for all his services rendered and to be rendered in the premises, the sum of $50 ; but in his presence and that of the makers delivered said receipts to John Means, a son of appellant, who also resided in Boyd county, Kentucky, and directed the deceased to correspond with him in relation to the business.

The Rentschler note was fully paid before due and the proceeds promptly remitted.    That of Arnfeldt was paid at maturity, but no information of the fact was given by deceased to appellant or to John Means, nor any reference made to the matter for more than a year afterward.    He wrote to John, Feb'y 26, 1876, inclosing draft for the amount of other collections but was silent as to this.    In his reply of March 6th acknowledging its receipt, John made express inquiry about the Arnfeldt note.    Getting no answer to this he wrote again on April 17th.    The first word he received in reference to it was in a letter of May 1st, containing a remittance on other accounts, and which deceased closed with the statement, " The Arnfeldt note will be paid and remitted by June 15th next ;" and this was the last that passed between them on the subject until November, 1880, when Arnfeldt, having in the meantime regularly paid to John Means by mail his series of notes for the residue, for $266.60 each, sent him the amount due upon the last and requested a release of the mortgage.    Then John addressed several letters to Arnfeldt and the deceased, calling attention to the fact that he had never received the money due on the first note, but got no answer.    He then wrote to

Fred Dittus, who had also purchased one of the parcels at the same sale, and was informed in reply, on Jan'y 5, 1881, that Arnfeldt had paid it in full to the deceased on the day it became due and had ever since had it, duly canceled, in his possession. Then followed two or three letters to Jenkins informing him of what he had learned, demanding a settlement and threatening legal proceedings, to which no answer was made. He wrote to Dittus in May, 1881, and again in October, asking the address of some suitable lawyer, but got no reply. And then the matter again rested until December, 1883, shortly after the death of Jenkins, when he employed attorneys to prosecute the claim and it was filed as hereinbefore stated.

The finding upon the issue joined was for the defendant and judgment was entered thereon in her favor for costs; to which the plaintiff duly excepted and which are the only errors here assigned.

From the foregoing it appears that appellant's cause of action against the deceased arose March 1, 1875, when the Arnfeldt note was paid. Cagwin v. Ball, 2 Bradwell, 70. International Bank v. Bartalott, 11 Id. 625. *Prima facie*, then, it was barred by limitation when this suit was brought. It was, however, kept from his knowledge, by mere silence of the deceased, until May 1, 1876, and then concealed by his written declaration, an affirmative act designed and adapted to deceive, and therefore a fraudulent concealment within the meaning of the 22d section of the statute (R. S. Ch. 83). International Bank v. Bartalott, *supra*. But this fraud was not of a character to perpetuate its immediate effect. Its operation was limited to the 15th of June then next, when, by the terms of the declaration, the money would be paid and remitted.

Conceding, then, that until that time appellant was justified in using no means to discover the cause of action, the single question presented by the record is whether, after that time and until Dec. 29, 1878, five years before the claim was filed, he used reasonable diligence to that end, or, if none, was still justified in his neglect by any act of the deceased.

Upon that question he held the affirmative and was bound to maintain it by a preponderance of evidence. Yet he pro-

duced literally none at all. The proof was all the other way. During that entire period of two and a half years, so far as appears he did absolutely nothing to discover his claim, either in person or through his son, who by his direction occupied his place in this behalf and whose negligence is therefore his own. John received from Arnfeldt directly, according to the original arrangement for payment, and regularly as they became due, the amounts of the other notes of the same series, though maturing later and bearing a smaller rate of interest. The natural presumption would be that the one previously due had been previously paid, and there was nothing to rebut it except the fact that he had not received the proceeds from the deceased, to whom by the same arrangement it was to be paid. Yet he made not so much as an inquiry about it of either of them or of anybody else. Indeed it is conceded that no effort of any kind or degree was ever used in this direction by appellant or his son. The discovery, when made to them, and which was not until the winter of 1880–81, was made without any agency on their part; and seeing that they could have made it so easily at any time after June, 1876, diligence of any sort, in that behalf, is conspicuous only by its absence.

All of this apparent negligence is claimed to have been justified or excused on the ground of confidence said to have been reasonably reposed in the integrity of the deceased. But such confidence, to excuse the want of diligence, must be founded upon some affirmative act done by him with reference to the particular matter in question. His official position, his general reputation, their long acquaintance—these will not suffice. In reference to this matter he had done nothing after May 1, 1876, but was simply silent, and mere silence is not enough. Conner v. Goodman, 104 Ill. 365. Wood v. Carpenter, 101 N. S. 135. In this case it should have created anxiety and led to inquiry. His previous neglect to report for more than a year after the time for payment had passed, his delay to notice their express and repeated request for information, his failure to explain the apparent default of Arnfeldt or his own negligence when he did notice them, and his

positive assurance of payment and remittance by the 15th of June, forbade his silence on and after that day. It was not necessary that they should suspect his integrity before they would be called upon to seek an explanation. To say nothing of the disappointment, his conduct from the first and especially at the last was so grossly unbusiness-like as to challenge their attention and demand inquiry. Their confidence in him was not justified by facts well known. In the exercise of ordinary diligence the first day of July, 1876, would have been none too soon to remind him of his promise and press him for report. More than four years elapsed without a step taken or a question asked in reference to the matter, and during all this time Arnfeldt himself was within easy reach.

We see no error in the finding and the judgment will be affirmed.

Judgment affirmed.